Insurance Commissioner
No. 6723

NEW HAMPSHIRE-VERMONT HOSPITALIZATION SERVICE

v.

FRANCIS E. WHALAND, INSURANCE COMMISSIONER

February 15, 1974

*Upton, Sanders & Smith (Mr. Richard F. Upton* orally) for the plaintiff.

*Warren B. Rudman,* attorney general, and *Edward A. Haffer,* attorney *(Mr. Haffer* orally), for the defendant.

KENISON, C.J. The primary issue in this case is the legality of the defendant insurance commissioner's order of May 14, 1973, in reference to the operation of the Blue Cross plan in New Hampshire. The commissioner ordered an annualized rate increase of 4.7 percent, which was

substantially less than that sought by the plaintiff, and required the plaintiff by supplemental orders to:

1. Eliminate existing distinctions in coverage and rates between group and nongroup subscribers;

2. Increase the maximum major medical lifetime benefits from $30,000 to $250,000 per covered claimant and to provide a maximum coinsurance payable clause no greater than $1,000 per year per covered claimant "without an increase in the major medical rate level;"

3. Reconstitute its board of directors so that a majority represent the working men and women of the state.

On rehearing, this order was reaffirmed by the commissioner on August 14, 1973, and an appeal was filed by the plaintiff pursuant to RSA 419:13 (Supp. 1973) and RSA ch. 541, alleging various grounds wherein the order was unlawful or unreasonable. On September 11, 1973, this court granted the plaintiff's motion for a temporary rate increase of 26.9 percent under bond, pending a determination of the legality of the May 14, 1973 order. *New Hampshire-Vermont Hospitalization Service v. Whaland,* 113 N.H. 461, 309 A.2d 508 (1973).

The factual context of the present case is similar to that of its companion case, *New Hampshire-Vermont Physician Service v. Durkin,* 113 N.H. 717, 313 A.2d 416 (1973), which involved the legality of the May 14, 1973 order in reference to the operation of the New Hampshire Blue Shield plan. *Cf. In re New Hampshire-Vermont Hospitalization Service,* 313 A.2d 6 (Vt. 1973). The history begins in July 1971, when Blue Cross filed for a rate increase of 33 percent in its basic subscriber contract and 14.8 per cent in the '65' contract pursuant to RSA 419:6. On May 8, 1972, after a series of joint hearings involving Blue Cross and Blue Shield, the insurance commissioner disapproved the request because the plaintiff had not met its burden of proof that the proposed rates were not "excessive, inadequate, or discriminatory." The plaintiff proposed several modifications over the following months, and on July 27, 1972, the insurance commissioner fin-

ally approved an annualized increase of 5.7 percent in Blue Cross' total revenue for 1972. He also ordered both Blue Cross and Blue Shield to reduce their contingency reserve funds, which functioned to protect them from a condition of temporary insolvency resulting from unusually large claims arising from a catastrophe, epidemic or serious economic dislocation, to a level of one month's claims and expenses.

The appropriate level of this fund has been disputed by the parties for several years. Although the fund had been considerably higher in former years, the plaintiff had been forced to lower its level so that by December 31, 1971 it amounted to 2.7 months of claims and expenses, approximately $8,000,000. At the hearings preceding the July 27, 1972 order, the insurance department's actuaries testified that one month's claims and expenses would be sufficient. Despite the testimony of the actuary of Blue Cross and Blue Shield that two months was the safe minimum, the plaintiff reluctantly agreed to try the level recommended by the department on a trial basis.

On November 30, 1972, Blue Cross filed for an average rate increase of 17.4 percent to become effective January 1, 1973. The contingency reserve fund had been reduced to approximately one month's claims and expenses, and in the plaintiff's view the proposed rate increase was designed to preserve the fund at this level. However, an insurance department actuary testified in joint hearings involving Blue Cross and Blue Shield that a ten-day reserve fund was adequate to meet the cash needs of the insurance companies. The insurance companies' actuary testified that he still believed that a two-month reserve was the safe minimum. On May 14, 1973, the commissioner issued the present order which authorized a rate increase designed to lower the reserve fund to ten days of claims and operating expenses. He stated that a ten-day reserve, amounting to approximately $1,000,000, was sufficient to meet any unforeseen difficulties and stressed that the cash position rather than the balance sheet was the more accurate measure of Blue Cross' ability to meet its obligations.

Financial data was introduced on rehearing by the plaintiff which showed that as of December 31, 1972, the average contingency reserve of the seventy-four Blue Cross plans in this country was 1.78 months of claims and operating expenses and that for the nineteen plans in the same size category as the plaintiff (500,000 to 1,000,000 members), the average was 2.34 months. This data demonstrated that the plaintiff's reserve of one month was lower than any other plan in its category (the nearest was 1.14 months), but that eleven other plans in other categories had smaller reserves. It also revealed that if the ten-day requirement were put into effect, the New Hampshire plan would have a lower reserve than all but six plans in the country. The defendant insurance commissioner, however, was not persuaded by this evidence that the reasoning of his May 14, 1973 order was faulty and reaffirmed his previous ruling. On December 31, 1973, the plaintiff's year-end statement showed that it lost $6,098,055 in 1973, even after giving effect to the 26.9 percent rate increase, and that the balance sheet showed a deficit of at least $2,563,255.

The plaintiff's primary contention is that the defendant's order requiring the ten-day contingency reserve cannot be reasonably supported by the facts for the reasons set forth in *New Hampshire-Vermont Physician Service v. Durkin,* 113 N.H. 717, 313 A.2d 416 (1973). In that case we held that the record contained no evidence other than conclusory opinions to support the position that the ten-day reserve would be adequate for the New Hampshire Blue Shield plan. The plaintiff asserts that a ten-day reserve would place it in a precarious financial position because the amount of the reserve would be insufficient to protect it from the fluctuations of the economy or an unexpected catastrophe, and would force it to operate from time to time under a condition of temporary insolvency in which its assets would be less than its liabilities. To support this position, the plaintiff draws attention to the present deficit in its balance sheet.

The defendant argues, on the other hand, that under RSA 541:13 the plaintiff must show by a clear prepon-

derance of the evidence that the commissioner's decision was unjust or unreasonable. He urges that the plaintiff has not met this burden of proof because, even though the 1973 year-end statement demonstrated that the defendant had miscalculated the appropriate rate increase to sustain a ten-day reserve, his order was reasonably designed to provide for the cash needs of the Blue Cross plan. Although the defendant recognizes that the plaintiff might be technically insolvent at times, he points to the successful operation of other plans at a level of ten days or less to bolster his argument that he acted reasonably in issuing the order.

A review of the record shows that the evidence relied upon by the commissioner to support the ten-day reserve is substantially the same as that relied upon in the Blue Shield case, and thus we agree with the plaintiff that the order is defective for the reasons articulated in that opinion. *See* 113 N.H. at 723-24, 313 A.2d at 421. In particular, although the financial data reveals that six other plans have operated at or below the ten-day level, we can find no evidence in the record to sustain a finding that such a reserve would be adequate to ensure the successful operation of the New Hampshire Blue Cross plan. There may be distinguishing factors affecting the other plans that would make them better adapted to a minimum reserve, and the record does not show that the commissioner took such considerations into account. There are also no financial data set forth in the record to buttress the commissioner's finding that a reserve of $1,000,000 would be sufficient to meet the needs of the New Hampshire plan. While a decision of the commissioner is prima facie reasonable under RSA 541:13, this presumption will be overcome by a showing that no evidence was presented in the record to sustain the order. *New England Tel. & Tel. Co. v. State,* 95 N.H. 353, 359, 64 A.2d 9, 15 (1949); 1 F. Cooper, State Administrative Law 259-62 (1965); 2 G. Couch, Insurance § 21:38 (2d ed. R. Anderson 1959, Supp. 1972).

It should be noted that we are not holding that a ten-day reserve is defective as a matter of law. *Cf. Peterborough*

*Sav. Bank v. King,* 103 N.H. 206, 210, 168 A.2d 116, 119 (1961). The fact that other plans have operated successfully with a minimum reserve is evidence that such a reserve could be found suitable for the New Hampshire plan. This decision lies within the sound discretion of the insurance commissioner under RSA 419:6, and we will not overturn his judgment if it is grounded on competent and substantial evidence and clearly, reveals the basis of his determination. *See* RSA 400-A:14 I, 23 II a (Supp. 1973); *New Hampshire-Vermont Physician Service v. Durkin,* 113 N.H. 717, 724, 313 A.2d 416, 421 (1973); *Application of Blue Cross,* 34 Ohio Misc. 29, 296 N.E.2d 305, 307-09 (Ct. Com. Pls. 1972); *Liberty Mut. Ins. Co. v. Larson,* 169 So. 2d 866, 872 (Fla. D.C. App. 1964); 4 K. Davis, Administrative Law Treatise § 29.02 (1958, Supp. 1970).

The plaintiff's next contention is that supplemental orders 1 and 2 must fail because the evidence supporting these orders was found to be insufficient in reference to the identical orders for the Blue Shield plan in *New Hampshire-Vermont Physician Service v. Durkin,* 113 N.H. 717, 724, 313 A.2d 416, 421-22 (1973). The defendant suggests, however, that the explanations set forth in the May 14, 1973 order demonstrate that the supplemental orders were based on evidence of Blue Cross' financial experience, and thus the orders are prima facie reasonable. We agree with the plaintiff that the Blue Shield decision is controlling and hold that these supplemental orders were improperly issued. *Id.* Although the commissioner has authority to issue such orders, he must act on the basis of competent and substantial evidence. In reference to supplemental order 1, the commissioner should have compiled data to provide a clear explanation of how nongroup individuals are unfairly deprived of benefits normally accorded to members of groups. Likewise, in reference to supplemental order 2, he should have demonstrated through financial and statistical evidence how the increase in major medical benefits could be accomplished without an increase in the rate level.

The plaintiff's final claim is that supplemental order 3 exceeds the commissioner's statutory authority. The de-

fendant argues in response that the Blue Shield decision impliedly conferred such authority on him. We can find nothing in the Blue Shield decision or in RSA ch. 419 which can be interpreted as vesting such authority in the commissioner. Where the legislature has intended to grant supervisory powers over the composition of an insurance company's board, it has expressly so stated. For example, under RSA 404-B:7 and D:7 (Supp. 1973), membership on the board of guaranty associations is subject to the commissioner's approval, and he may deny such approval where he finds that all member insurers are not fairly represented. Or under RSA 420:7 (Supp. 1973), the companion statute to RSA ch. 419, the approval of the New Hampshire Medical Society must be obtained for the majority of the directors on a medical service corporation board. It is clear that the commissioner is without such authority under RSA ch. 419, and supplemental order 3 is ineffective.

*Remanded.*

DUNCAN, J., and GRIMES, J., did not sit; the others concurred.